Judge Robertson
delivered the opinion oí’ tho Court.
In 1783, James Bell placed in the hands of William Patton, a land warrant, with a request, that he would locate it for him.
On the 29th of November, 1785, an entry, in the name of James Bel], was made for three hundred acres on the warrant, and on the 10th of November, 1797, the entry was surveyed in the name of Bell.
There is an endorsement on the plat and certificate, purporting to be an assignment of them bj James Bell to Andrew Barnet, the appellee»
*517 On the 16th of June, 1799, a patent issued to Andrew Barnet, for the three hundred acres of land, thus entered and surveyed, in the name of Bell.
In 1807, Bell brought a suit in. chancery, against Barnet, alleging, that Barton, without any authority, had sold his warrant to William Barnet, who made the entry and survey, and assigned them, without his knowledge or assent, to A. Barnet; and praying for a conveyance of the legal title to himself.
On cross appeals from the decree of the Green circuit court, this court, in 1816, decided that Bell was entitled to the land, (the foregoing facts having been satisfactorily established) and remanded the cause, with instructions, to ascertain and allow to Barnet a reasonable compensation, for securing the legal title to the land, and to make “such other orders and decrees, as may be consistent with equity.” See IV. Bibb, 447.
After the return of the case to the circuit court, Bell having died, the suit was revived in the name of his heirs, by bill of revivor.
After which, Barnet filed an answer, in the nature of a cross bill, charging that he had, bona fide, made improvements on the land, of the value of $2000 and praying for a decree for their value.
In their ansvrer to this cross bill, the heirs deny Barnet’s right to compensation, for improvements.
Commissioners, appointed to value the improvements, reported that they were worth $3,869 50 cents.
This report being objected to by the heirs, the court, without making any order in relation to it, or otherwise disposing of it, appointed other commissioners.
After the report of the first commissioners, Barnet amended his cross bill, by inserting $6,000, instead of $2,000, as the value of his improvements;
After this amendment was made, the new commissioners made their report, in which, they estimated the improvements at $6,216 16 cents., and the rents *518 at $1,112 50 cents, leaving a balance in Barnet’s favor, of $3,003 75 cents.
A jury having assessed the compensation of Bar-net, for the location of the warrant, and perfection of the title, to $284, the circuit court decreed to him this latter sum, and that reported by the commissioners, as the balance due for improvements, after deducting one year’s rent, which the commissioners had omitted, inadvertantly, to allow.
The report of the commissioners allowed to Bar-net $25 an acre, for clearing land; $3 50 cents, for “planting and raising apple trees;” and for improvements made after the final decree in this court, in November, 1816, it allowed him $1,983 66 cents, of which, $1,194 16 cents, are for a dwelling house; $225 for “outhouses;” $537 50 cents for clearing twenty-one and one half acres of land; $1,000 for making and putting up “two thousand rails; and $7 for “planting and raising''1 two apples trees.
Exceptions were filed to the report, but were overruled by the court.
Several irregularities are exhibited in the preparatory proceedings. But, waiving these as not now essential, we shall proceed, at once, to notice the principles and details of the report, which was ratified and confirmed by the decree of the circuit court.
That it was consistent with most approved principles of equity, to allow Barnet compensation for his lasting and valuable improvements, we are not disposed to doubt. It is true, that he neither held adversely to Bell, nor under a purchase from him. But in “foro conscienscim" he would be considered as virtually, a purchaser; and is, therefore, entitled to all the equitable rights incident to such a relation. There is nothing in the record, which would warrant the imputation of fraud in the acqusition of the legal title, or of bad faith in the occupancy of the land, prior to the institution of the suit by Bell, or even during its pendency in the circuit court, antecedently to the decision of it by this court. Nor could we say that the retention of the possession, even until this time, has been in fact, “maiajide.”
Person ac-tokml^and entering on it bonafide, sup-must be paid pavement,
Such occupant must be improre-must be^har-Ked rent for lo,"rent/or improvements¿ annually, as maJewere
Although William Barnet had no authority to make the assignment, and exhibited none, neveriheless, as warrants were sometimes transferred, by livery simply, and as there is no badge of fraud, but intrinsic evidence of fairness and good faith, in the contract of assignment, we feel no hesitation in considering it sufficiently manifest, that Andrew Barnet acquired the title to the land, and entered upon it “bona jidef supposing it to be his own.
We are inclined, therefore, to treat h.im, for all the purposes of this controversy, as one who had bought the land from James Bell by a verbal contract, which Bell could disregard. Barnet can, certainly, not reasonably expect, and, as a just man, ought not to desire more.
Placing the parties in this relative attitude, which is more favorable to Barnet than any other,'which equity could tolerate, the general principle, which should regulate their mutual rights and liabilities, may be seen in the case of Ewing’s heirs, et al. vs. Handley’s executors, IV. Littell’s Reports, 371-4.
Up to November, 1816, when it was decided by this court, that the land was Bell’s, Barnet should be alio wed the actual value or costs of the improvements which he had made, to be estimated at the times, respectively, when they were made, that is the original value or prime cost.
And he should be charged with the rents and profits, that is, the actual value of the use of the land and of the improvements annually, as they were upon it.
This principle has been outraged by the commissioners, and disregarded by the circuit court.
Although we have no other evidence in the record, of the value of the improvements, than the report of the commissioners; and, although we shall yield a reasonable, and even a very liberal credence to the opinions of the commissioners, and ought not to set aside their report, without clear and satisfactory evidence of its injustice, yet, notwithstanding all this allowance, we cannot conceal from our own judgments and consciences, the erroneous and unprece *520 dented exorbitance of the estimate, for clearing binds Twenty-five’ dollars an acre, must be too much. What did the clearing cost? How much time would have been necessarily consumed by one laboring man, in clearinsr one acre? For what could he have been hired? These are the proper criteria of cost. Was the land, after it was cleared, worth twenty-five dollars an acre? If it were not, the owner ought not lo be charged with that sum, for cutting down and destroying his timber.
Chancellor will judicial ly know, the history and topography of the country, and the ordinary price of labor, and if no peculiar reason appear to the contrary, will ex ojjido, quash report of commissioners, allowing an unjust and excessive price for cle'ring land, or mi-kins; other improvements.
Report of commissioners, allowing $25 per acre, for cleadng land, should be quashed, unless peculiar circumstances are exhibited to justify ft.
What judicial knowledge we have of the history and topography of the country, and of the prices of ordinary labor, will not allow us to doubt that this valuation of the cost of clearing, is excessively high, and palpably unjust.
The conscience of the chancellor must be surprised at it, and cannot sanction it; and, for this reason alone, if there were no other, the report ought to have been quashed. It ought to have been set aside as promptly, as it surley would have been, if the allowance had been one hundred dollars,or even five hundred dollars, an acre. It is as evident, that the one is two high, as that either of the others would be. The only difference, is in degree. Such a report could not be sustained, unless some peculiar and extraordinary facts were exhibited, to justify if. None such are shewn, or can be presumed to have existed; and therefore, the circuit court ought, for this reason, to have set aside the report.
The commissioners ought not to have allowed Barnet for “planting and raising” apple trees. He is entitled to compensation for planting alone. He should not be paid for (he growing of the trees. This being a process of. nature, cost him neither labor nor money.
It was not right to allow Barnet the cost of the improvements which were made after the decision against him, by this court, in November, 1816. He knew when he made these, that the land was not his and never could be, unless he should purchase it again from Bell, or his heirs.
These improvements, in the eye of the chancellor, were therefore, not made ubona fAef* and conse *521 quently, the reason for allowing their costs céases, ;md ílratione cessante cessat itiam fe*.’’ By the common law, he would not be allowed any thing for such improvements, however expensive.
Improvements made by occupant, after decision of court against his title to land, are not bona fide. , Therefore, he is not entitled to their prime costs, but only to so much, aulmentedVe vendible price of the land,
malafide, shall receive nptbing for ¡^ñts,Pnníesfe they render lancl really more valúa-ble.
As bonafiie 0jt®uP®f*™ oost7forhis improye-inents, ire should pay ior use from time of making them.
*521 Betas one man should not be benefited by another’s labor or money, without making an adequate recompense, and as Bell’s heirs should do what is just, before they exact equity from Barnet, they should be held accountable for ameliorations. If their land, when they receive it, shall be enhanced in value, or in its vendible price, by the improvements put upon it since 1816, to the extent of such augmented valúe, they should be charged.
But if the land be not really more valuable in consequence of these improvements, they should pay nothing for thern; because they were made by one, who ■knew, without any doubt, that he was makiiig use of theirland without their consent. Will the land sell for more thanit would,if these latter improvements had not been put upon it? If it would, how much more? This accession, whatever it may be, should be charged to the heirs. But this is all that they should pay for the improvements made since 1816.
Nothing was allowed by tbecommissionersorby the court, for rents, since 1816. The reason for this omission is not stated, nor can any be perceived. If Bar-net should pay for occupying the land, when he honestly considered it his own, he should surely be held responsible for, at least, the reasonable value of t\\e use, whilst he knew that it belonged to another, to whose heirs he would be compelled to surrender it.
If the commissioners could have supposed, that ■clearing the land, was worth twenty-five dollars an acre, it seems to us, that they ought to have estimated the use of it, after it was so expensively improved, at more than one dollar and twenty-five cents, per acre.
And if it were worth no more than one dollar and twenty-five cents, when first cleared, it was worth more, progressively, as more improvements were made upon it, unless the soil deteriorated in a correspondent ratio.
If occupant be charged nothing fot Use of improvements made by him, he should be allowed only for their present value, or the actual amelioration.
Bona fide occupant is'responsible for ■ waste.
For, as Barnet is entitled to be allowed what bis improvements Cost, he should pay something for the use of them, from the time of making them. This' is the rule of reciprocity, and the principie of equity.’
If he be not charged any thing for the use of the improvements, after the land was cleared and enclosed, he ought not to be allowed more, for them, than their present value, or the actual amelioration.
But the commissioners have allowed no more for rent for the last year, than for the first, although, in the intermediate time, many improvements are charged to a large amount. Was their use of no value? If so, the appellants should not pay any thing for them. The only reason why they aré chargeable with them, is, that they are supposed to have increase ed the vaiue and productiveness of théir land, and consequently, to have yielded them profit.
It is singular that the court should have allowed three dollars and fifty cents, for planting and Raising” each apple tree, and should have charged nothing for the use of them; and it is signally unjust, that large sums have been allowed for houses and other improvements, placed on the land, since 1816», when it has been deemed unjust to charge Barnet, even one cent íor the( use of them or the land.
The first report, although less exceptionable than !$hé. j#gt, is liable to the same objections in principle. ThS-icourt took no notice of it. But we suppose that •it was considered as waived, or set aside. There ought, however, to have been some entry in relation to it, on the record.
For the errors which have been noticed, the decree of the circuit court is reversed, the reports of the commissioners set aside, and the cause remaqded, with instructions to ascertain the actual Value, or prime-bpst, of all the improvements made on the land by Barnet,prior to the 1st oí October, 1816; the value of the use of the land, with the improvements, up to thq same time; its value since that time, without the additional improvements since put upon it; and the ■accession of value, if any, to the real value or vendí» •ble price of the land', which shall have been produced- *523 ibj these latter improvements, together, with, the waste, if any, during the whole occupancy; and then to render a final decree accordingly, and conformably to the principles of this opinion.
Petition foro se-hearing. '
Biggin, for appellant; Owsley, Hardin, and Talbotj for appellee.